# EXHIBIT I

ORIGINAL FILED

AUG 1 3 2014

Sherri R. Carter, Executive Officer/Clerk
By: Nancy Navarro, Deputy

SUPERIOR COURT OF CALIFORNIA

COUNTY OF LOS ANGELES

| | |
|---|---|
| WILLIAM MOUNT and MADELINE MOUNT, individually and on behalf of all those others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>WELLS FARGO BANK, N.A. d/b/a AMERICA'S SERVICING COMPANY, and DOES 1 through 100, inclusive,<br><br>Defendants. | Case No.: BC395959<br><br>ORDER GRANTING MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT<br><br>Date: August 13, 2014<br>Time: 11:00 a.m. |

## I.  BACKGROUND

This is a consumer class action brought by Plaintiffs William Mount and Madeline Mount (jointly, "*Mount* Plaintiffs") on behalf of California-based mortgage borrowers of Defendant Wells Fargo Bank, N.A. ("Wells Fargo"). The complaint alleges, *inter alia*, that Wells Fargo recorded and/or monitored outgoing telephone calls that it made to consumers without the knowledge and consent of such consumers. Based on these and other allegations, the *Mount* Plaintiffs alleged causes of action for invasion of privacy in violation of Penal Code §630, *et seq.*, negligence, and common law invasion of privacy. See Complaint filed 8/7/08.

Separately, Plaintiff Schuyler Hoffman ("*Hoffman* Plaintiff") filed a similar class action against Wells Fargo in the U.S. District Court for the Southern District of California (Case No. 3:12-cv-00554-L-DHB) ("*Hoffman* Action").

Following multiple settlement conferences, Wells Fargo, the *Mount* Plaintiffs, and the *Hoffman* Plaintiff ultimately entered into a *Settlement Agreement and Release* ("settlement agreement"). As part of the settlement agreement, the parties agreed to allow the *Hoffman* Plaintiff to join this action[1] and to request an order for leave to file a First Amended Consolidated Class Action Complaint that includes the *Hoffman* Action. See Settlement Agreement, §§3.03, 3.04(a) and Exhibit B.

The *Mount* and *Hoffman* Plaintiffs then filed a motion for preliminary approval of the settlement agreement, which the Court granted on 4/8/14.

Now before the Court is the motion for final approval of the settlement agreement.

## II. DISCUSSION

A. <u>SETTLEMENT CLASS DEFINITION</u>

The proposed settlement class is defined as: "California borrowers (a) who, during the period July 13, 2006, to December 31, 2012, had a telephone conversation with Wells Fargo in connection with Wells Fargo's servicing of a real-estate secured loan; (b) whose loans were originated or serviced by Wells Fargo Financial and who had a telephone conversation with Wells Fargo after November 10, 2011, through December 31, 2012; or (c) whose payment option mortgage loans were originated or serviced by Wachovia Mortgage, FSB, formerly

---

[1] The parties in the *Hoffman* Action filed a joint motion for dismissal pursuant to Federal Rules of Civil Procedure rule 41(a)(1), which the district court granted. See Settlement Agreement, §3.03. The district court dismissed the *Hoffman* Action without prejudice to the *Hoffman* Plaintiff's right to join this action. Id.

known as World Savings Bank, FSB, and who had a telephone conversation with Wells Fargo after November 30, 2010, through December 31, 2012." See Settlement Agreement, §2.21.

B.     **TERMS OF SETTLEMENT AGREEMENT**

A signed copy of the settlement agreement is attached to the Kiesel Declaration Re: Final Approval as Exhibit C. Its essential terms are as follows:

- For purposes of settlement only, the parties stipulate to class certification. §3.01.
- The gross settlement amount is $5,600,000.[2] §2.23.
- The following will be deducted from the gross settlement amount:
    - Up to $1,916,667 for attorney fees <u>and</u> costs;[3]
    - $55,000 for incentive awards;[4] and
    - "All" claims administration costs.[5]
- Each participating class member will receive a pro rata share of the net settlement amount. For pro rata distribution purposes and prior to the deduction of attorney fees and costs, incentive awards, and claims administration costs, $5,000,000 of the gross settlement amount will be allocated to class members who were called during the period of 7/13/06 through 10/3/08, and $600,000 of the gross settlement amount will be allocated to class members who were called during the period of 10/4/08 through 12/31/12.[6] A class member may claim under both allocations. §5.01.
- The check-cashing period expires six months from the date of issuance. §5.05.

---

[2]     This amount is non-reversionary. See Motion for Final Approval, 3:15-17.
[3]     See Settlement Agreement, §5.04(c).
[4]     See Settlement Agreement, §5.04(a). This includes $25,000 to each of the *Mount* Plaintiffs and $5,000 to the *Hoffman* Plaintiff. Id.
[5]     See Settlement Agreement, §5.03. In connection with the motion for preliminary approval, Plaintiffs advised the Court that the parties obtained a capped quote of $248,000 for claims administration costs. See Further Briefing Re: Preliminary Approval, §V.
[6]     This allocation is based on Wells Fargo's representation that after 10/4/08, it provided a warning to callers of its call recording practices. See Kiesel Declaration Re: Preliminary Approval, ¶8.

3

- Funds attributable to uncashed checks will be equally paid as *cy pres* to the Berkman Center, UC Hastings Privacy and Technology Project and the Privacy Rights Clearinghouse. §5.05.

- Participating class members will release all claims "that result from, arise out of, are based upon, or relate to the conduct, omissions, duties or matters during the Class Period that were or could have been alleged in the Actions, including, without limitation, any claims, actions, causes of action, demands, damages, losses, or remedies relating to, based upon, resulting from, or arising out of telephone conversations concerning any and all real estate-secured loans serviced by Wells Fargo that were recorded, eavesdropped upon, wiretapped, or monitored by Wells Fargo, and that such recording, eavesdropping, wiretapping or monitoring, or alleged failure to obtain consent prior to such recording, eavesdropping, wiretapping or monitoring is itself the basis for the claim." This release includes "purported violations of the Privacy Act set forth in California Penal Code sections 630, *et seq.*, purported violations of California Business & Professions Code sections 17200, *et seq.*, negligence, and any violation of the common law right of privacy to the extent they involve claims based on the recording of telephone conversations which took place in connection with the servicing of real estate-secured loans by Wells Fargo that were recorded, eavesdropped upon, wiretapped, or monitored by Wells Fargo." §5.06.

- The named Plaintiffs will provide a general release and a concurrent Civil Code §1542 waiver. §5.07(a) and (b).

- CPT Group, Inc. will be the claims administrator. §2.02.

///

### C. ANALYSIS OF SETTLEMENT AGREEMENT

#### 1. Standards for Final Fairness Determination

"Before final approval, the court must conduct an inquiry into the fairness of the proposed settlement." CRC 3.769(g). "If the court approves the settlement agreement after the final approval hearing, the court must make and enter judgment. The judgment must include a provision for the retention of the court's jurisdiction over the parties to enforce the terms of the judgment. The court may not enter an order dismissing the action at the same time as, or after, entry of judgment." CRC 3.769(h).

"In a class action lawsuit, the court undertakes the responsibility to assess fairness in order to prevent fraud, collusion or unfairness to the class, the settlement or dismissal of a class action. The purpose of the requirement [of court review] is the protection of those class members, including the named plaintiffs, whose rights may not have been given due regard by the negotiating parties." See Consumer Advocacy Group, Inc. v. Kintetsu Enterprises of America (2006) 141 Cal. App.4th 46, 60 (internal quotation marks omitted); see also Wershba v. Apple Computer, Inc. (2001) 91 Cal.App.4th 224, 245 (Court needs to "scrutinize the proposed settlement agreement to the extent necessary to reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties, and that the settlement, taken as a whole, is fair, reasonable and adequate to all concerned") (internal quotation marks omitted).

"The burden is on the proponent of the settlement to show that it is fair and reasonable. However 'a presumption of fairness exists where: (1) the settlement is reached through arm's-length bargaining; (2) investigation and discovery are sufficient to allow counsel and the court to act intelligently; (3) counsel is experienced in similar litigation; and (4) the percentage of

objectors is small.'" See Wershba at 245 (citing Dunk v. Ford Motor Co. (1996) 48 Cal.App.4th 1794, 1802. Notwithstanding an initial presumption of fairness, "the court should not give rubber-stamp approval." See Kullar v. Foot Locker Retail, Inc. (2008) 168 Cal.App.4th 116, 130. "Rather, to protect the interests of absent class members, the court must independently and objectively analyze the evidence and circumstances before it in order to determine whether the settlement is in the best interests of those whose claims will be extinguished." Id. In that determination, the court should consider factors such as "the strength of plaintiffs' case, the risk, expense, complexity and likely duration of further litigation, the risk of maintaining class action status through trial, the amount offered in settlement, the extent of discovery completed and stage of the proceedings, the experience and views of counsel, the presence of a governmental participant, and the reaction of the class members to the proposed settlement." Id. at 128. "Th[is] list of factors is not exclusive and the court is free to engage in a balancing and weighing of factors depending on the circumstances of each case." Wershba at 245.

Nevertheless, "[a] settlement need not obtain 100 percent of the damages sought in order to be fair and reasonable. Compromise is inherent and necessary in the settlement process. Thus, even if 'the relief afforded by the proposed settlement is substantially narrower than it would be if the suits were to be successfully litigated,' this is no bar to a class settlement because 'the public interest may indeed be served by a voluntary settlement in which each side gives ground in the interest of avoiding litigation.'" Id. at 250.

2. **Does a presumption of fairness exist?**

    a.    <u>Was the settlement reached through arm's-length bargaining?</u> Yes. Prior to ultimately entering into the settlement agreement, the parties engaged in informal settlement discussions, participated in multiple settlement conferences before the

Hon. Peter D. Lichtman, and attended an Early Neutral Evaluation Conference before the Hon. David H. Bartick in the Southern District of California. See Kiesel Declaration Re: Preliminary Approval, ¶¶5, 7; see also Motion for Final Approval, 2:16-23, 3:3-8.

    b.    <u>Were investigation and discovery sufficient to allow counsel and the court to act intelligently?</u> Yes. Class counsel, *inter alia*: exchanged written discovery with Wells Fargo; deposed four Wells Fargo employees; and defended the depositions of the *Mount* Plaintiffs. See Kiesel Declaration Re: Final Approval, ¶11.

    c.    <u>Is counsel experienced in similar litigation?</u> Yes. Class counsel is experienced in class action litigation, including consumer cases. Id., ¶21 and Exhibit F.

    d.    <u>What percentage of the class has objected?</u> There were 4 (.0007%) objections out of 562,394 postcard notices mailed. See Morales Declaration,[7] ¶¶6, 12, and Exhibit F.

CONCLUSION: The settlement is entitled to a presumption of fairness.

3. <u>Is the settlement fair, adequate, and reasonable?</u>

    a.    <u>Strength of Plaintiffs' case.</u> "The most important factor is the strength of the case for plaintiffs on the merits, balanced against the amount offered in settlement." See <u>Kullar v. Foot Locker Retail, Inc.</u> (2008) 168 Cal.App.4th 116, 130. In connection with the motion for preliminary approval, Plaintiffs estimated their potential recovery at trial to be $5,000 for each violation of Penal Code §632 committed by Wells Fargo. See Further Briefing Re: Preliminary Approval, §II (citing to Penal Code §637.2(a)(1)). Thus, based on the class size,

---

[7] This declaration is entitled "Declaration of Claims Administrator in Support of Plaintiffs' Motion for Final Approval of Class Action Settlement and Motion for Attorneys' Fees, Costs and Incentive Award."

Plaintiffs' potential recovery is in the *billions* of dollars. Notwithstanding such estimate, the $5,600,000 gross settlement amount appears to be a fair, adequate, and reasonable compromise of Plaintiffs' claims for the following reasons: First, Wells Fargo denies that it has/had a policy or practice of recording telephone calls without the consumers' knowledge and consent. See Settlement Agreement, §1.08. If believed by the trier of fact, Plaintiffs will recover nothing. Second, Penal Code §632 requires a finding that the subject telephone calls were "confidential communications." Third, even if liability were established, the amount of statutory damages could be deemed unconstitutionally excessive. Fourth, Plaintiffs risk non-certification due to the individualized issues involved (e.g., expectation of the class member at the time of the recording of the telephone call).

b. <u>Risk, expense, complexity and likely duration of further litigation.</u> Given the nature of the class claims, the case is likely to be expensive and lengthy to try. Procedural hurdles (e.g., motion practice and appeals) are also likely to prolong the litigation as well as any recovery by the class members.

c. <u>Risk of maintaining class action status through trial.</u> Even if a class is certified, there is always a risk of decertification. See <u>Weinstat v. Dentsply Intern., Inc.</u> (2010) 180 Cal.App.4th 1213, 1226 ("Our Supreme Court has recognized that trial courts should retain some flexibility in conducting class actions, which means, under suitable circumstances, entertaining successive motions on certification if the court subsequently discovers that the propriety of a class action is not appropriate.").

    d.    <u>Amount offered in settlement.</u> As indicated above, the gross settlement amount is $5,600,000. Based upon the requested fee and cost awards to class counsel, enhancement awards to the *Mount* and *Hoffman* Plaintiffs, and claims administration costs, $3,347,333[8] will be available for distribution to claimants. Based on 23,772 claimants (see below), the average settlement share is approximately $140.81[9] ($3,347,333 ÷ 23,772).

    e.    <u>Extent of discovery completed and stage of the proceedings.</u> As discussed above, at the time of the settlement, Plaintiffs had conducted extensive discovery.

    f.    <u>Experience and views of counsel.</u> The settlement was negotiated and endorsed by class counsel who, as indicated above, is experienced in class action litigation, including consumer cases.

    g.    <u>Presence of a governmental participant.</u> This factor is not applicable here.

    h.    <u>Reaction of the class members to the proposed settlement.</u>

| | |
|---|---|
| Number of class members: | 562,394[10] |
| Number of postcard notices mailed: | 562,394[11] |
| Number of undeliverable notices: | 18,983[12] (3.38%) |
| Number of opt-outs: | 43[13] (.008%) |
| Number of objections: | 4[14] (.0007%) |

---

[8] $5,600,000 (gross settlement amount) minus $1,634,000 (*Mount* counsel's fees), $86,047.04 (*Mount* counsel's costs), $196,204.96 (*Hoffman* counsel's fees), $415 (*Hoffman* counsel's costs), $50,000 (enhancement awards to *Mount* Plaintiffs), $5,000 (enhancement award to *Hoffman* Plaintiff), and $281,000 (claims administration costs).

[9] The actual average settlement share will be higher due to the reduction of the *Mount* Plaintiffs' enhancement awards.

[10] See Morales Declaration, ¶6.
[11] See Morales Declaration, ¶6.
[12] See Morales Declaration, ¶7.
[13] See Morales Declaration, ¶11 and Exhibit E.

Number of claims: 23,772[15] (4.23%)

CONCLUSION: The settlement can be deemed "fair, adequate, and reasonable." All in all, the settlement was favorably received by class members. The claims rate is better than the claims rates in comparable privacy class actions. See Motion for Preliminary Approval, FN4 (citing to privacy class actions with claims rates of less than 1% and a slightly over 2%). The opt-out and objection rates are minuscule in comparison to the class size. In addition, the settlement is non-reversionary and all funds attributable to uncashed checks will be distributed to non-profit organizations involved with consumer privacy rights. See Koncius Declaration, Exhibits A to C.

D. **ATTORNEY FEES AND COSTS**

As for attorney fees, *Mount* counsel requests **$1,634,000** and *Hoffman* counsel requests **$196,204.96**.

The billing records reflect the following lodestar calculations:

*Mount* counsel

| Timekeeper | Hours | Hourly Rate | Total |
|---|---|---|---|
| KIESEL LAW LLP[16] | 1,416.22 | $625 to $1,100 (Partners)<br>$325 to $500 (Associates)<br>$150 (Paralegals)<br>$150 (Support Staff) | $717,679.75 |
| JOHNSON & JOHNSON, LLP[17] | 115.65 | $300 to $900 | $ 83,865.00 |
| TOTAL | 1,531.87 | | $801,544.75 |

---

[14] See Morales Declaration, ¶12 and Exhibit F.
[15] See Morales Declaration, ¶16. This includes 22,040 timely claims and 1,732 late claims. The Court exercises its discretion to accept the late claims.
[16] See Notice of Lodging of Kiesel Law LLP and Johnson & Johnson LLP Time and Cost Records, Exhibit A; Kiesel Declaration Re: Final Approval, Exhibit A. The former appears to contain the more recent information.
[17] See Notice of Lodging of Kiesel Law LLP and Johnson & Johnson LLP Time and Cost Records, Exhibit C; Johnson Declaration Re: Final Approval, Exhibit A. The latter appears to contain the more recent information.

<u>Hoffman</u> counsel

| Timekeeper | Hours | Hourly Rate | Total |
|---|---|---|---|
| KAZEROUNI LAW GROUP[18] | | | |
| • Abbas Kazerounian | 115.20 | $595 | $ 68,544.00 |
| • Matthew M. Loker | 81.20 | $350 | $ 28,420.00 |
| HYDE & SWIGART[19] | 123.20 | $595 | $ 73,304.00 |
| TOTAL | 319.60 | | $170,268.00 |

Based on a review of class counsel's billing records, the hours spent on the tasks performed appear to be reasonable for this six-year-old case. The hourly rates charged also appear to be reasonable and in line with prevailing rates in the community. Accordingly, the actual attorney fees of $801,544.75 for *Mount* counsel and $170,268.00 for *Hoffman* counsel can be deemed the lodestars.

*Mount* counsel's fee request of $1,634,000 translates into a multiplier of approximately 2.04 and *Hoffman* counsel's fee request of $196,204.96 translates into a multiplier of approximately 1.15. The lodestar may be adjusted based on factors such as "the quality of the representation, the novelty and complexity of the issues, the results obtained, and the contingent risk presented." See <u>Thayer v. Wells Fargo Bank, N.A.</u> (2001) 92 Cal.App.4th 819, 833. Applying these factors, this case appears to be of medium difficulty to litigate. The issues were not particularly novel or difficult in this consumer case. Nevertheless, class counsel, who is well-qualified to litigate consumer cases, obtained a $5,600,000 non-reversionary settlement. Further, class counsel accepted this case on a contingency basis. As a result, class counsel has

---

[18] See Kazerounian Declaration Re: Attorney Fees, ¶¶16, 24 and Exhibit A; Loker Declaration Re: Attorney Fees, ¶10.
[19] See Swigart Declaration Re: Attorney Fees, ¶13 and FN1; Kazerounian Declaration Re: Attorney Fees, ¶24 and Exhibit A.

risked nonpayment of the thousands of costs advanced and hundreds of attorney time worked. On balance, application of the foregoing factors supports a modest adjustment of the lodestars.

If cross-checked against the settlement amount, the *Mount* counsel's fee request represents 32.68% of the $5,000,000 fund and the *Hoffman* counsel's fee request represents 32.70% of the $600,000 fund. These percentages are slightly below the average generally awarded in class actions. See In re Consumer Privacy Cases (2009) 175 Cal.App.4th 545, 558, FN13 ("Empirical studies show that, regardless whether the percentage method or the lodestar method is used, fee awards in class actions average around one-third of the recovery.").

For all of the foregoing reasons, the fee requests may be approved.

As for costs, *Mount* counsel requests $86,047.04[20] ($83,217 to KIESEL LAW LLP + $2,830.04 to JOHNSON & JOHNSON, LLP) and *Hoffman* counsel requests $415.[21] The costs incurred appear to be reasonable and necessary to this litigation and may therefore be approved.

E.   INCENTIVE AWARD TO CLASS REPRESENTATIVE

An incentive fee award to a named class representative must be supported by evidence that quantifies time and effort expended by the individual and a reasoned explanation of financial or other risks undertaken by the class representative. See Clark v. American Residential Services LLC (2009) 175 Cal.App.4th 785, 806-807; see also Cellphone Termination Cases (2010) 186 Cal.App.4th 1380, 1394-1395 ("[C]riteria courts may consider in determining whether to make an incentive award include: 1) the risk to the class representative in commencing suit, both financial and otherwise; 2) the notoriety and personal difficulties encountered by the class representative; 3) the amount of time and effort spent by the class

---

[20]   See Kiesel Declaration Re: Final Approval, Exhibit B; Notice of Lodging of Kiesel Law LLP and Johnson & Johnson LLP Time and Cost Records, Exhibit B; Johnson Declaration Re: Final Approval, Exhibit B.
[21]   See Swigart Declaration Re: Attorney Fees, Exhibit A.

representative; 4) the duration of the litigation and; 5) the personal benefit (or lack thereof) enjoyed by the class representative as a result of the litigation. [Citations.]")

Here, each of the *Mount* Plaintiffs requests $25,000 and the *Hoffman* Plaintiff requests $5,000.

The *Mount* Plaintiffs state that they: were each deposed and were present for the other's deposition; reviewed their deposition transcripts; provided documents in response to Defendant's request for production of documents; assisted class counsel in responding to form interrogatories; remained accessible to class counsel; reviewed documents filed by class counsel; and provided input on decisions made by class counsel. See M. Mount Declaration, ¶¶8-11; W. Mount Declaration, ¶¶8-11.

Notwithstanding the *Mount* Plaintiffs' contributions of time and effort to this six-year-old case, the requested enhancement awards appear to be excessive and should be reduced to $10,000 for each of them.

The *Hoffman* Plaintiff states that he: communicated with class counsel (in person and telephonically); participated in discovery; provided input throughout the mediation process; reviewed the settlement agreement and discussed it with class counsel; and reviewed documents. See Hoffman Declaration Re: Attorney Fees and Incentive Award, ¶¶3-7. The request of $5,000 appears to be a reasonable inducement for the *Hoffman* Plaintiff's participation in this litigation.

///

///

///

F. <u>Objections</u>[22]

    a.     <u>James Collins and Denise Phillips</u>

First, Mr. Collins and Ms. Phillips question the need for claim forms and ask "[w]hy can't Wells Fargo just cut a check to each class member . . . ?" See Objection to Proposed Settlement, 8:3-4. They do recognize that the parties are <u>not</u> required to construct a settlement that automatically pays class members who do not opt out of the settlement, but state that "when [the parties] do not, the court must infer that it was the parties' intent to reduce the amount actually paid to the class." Id., 8:26-28. The court will not make such an inference, particularly because the settlement is non-reversionary. Under the terms of the settlement agreement, the entirety of the net settlement amount will be distributed to the claimants and any funds attributable to uncashed checks will be donated to cy pres recipients. This objection is OVERRULED.

Second, Mr. Collins and Ms. Phillips object to the fact that the average recovery to claimants is uncertain. Id., §IV.B. This objection is not well-taken. The settlement shares are capable of determination based upon the formula set forth in §5.01 of the settlement agreement. This objection is OVERRULED.

Third, Mr. Collins and Ms. Phillips object to the $25,000 incentive award to each of the *Mount* Plaintiffs. Id., §IV.C. As discussed in §II.E, above, the Court agrees that $25,000 for each of the *Mount* Plaintiffs is excessive. This objection is SUSTAINED.

Lastly, Mr. Collins and Ms. Phillips challenge class counsel's attorney fees as "unreasonably high." Id., §IV.D. For the reasons set forth in §II.D, above, class counsel's attorney fees are approved. This objection is OVERRULED.

---

[22]     See Exhibit F to Declaration of Claims Administrator in Support of Plaintiffs' Motion for Final Approval of Class Action Settlement and Motion for Attorneys' Fees, Costs and Incentive Award.

b.  Stephen A. Kron

First, Mr. Kron objects to the fact that class members cannot view all of the options available to them. See Objections to Proposed Class Action Settlement, §I. This statement is incorrect. The settlement website, www.mountwfbanksettlement.com, allows class members to view the settlement agreement, long-form class notice, and other important information. This objection is OVERRULED.

Second, Mr. Kron objects to the fee award to class counsel. Id., §II. For the reasons set forth in §II.D, above, class counsel's attorney fees are approved. This objection is OVERRULED.

Third, Mr. Kron objects to the fact that no estimate of class member recovery is provided. Id., §III. Although no estimate was provided, the long-form class notice expressly advised class members that "payments to Class Members will be prorated by dividing the applicable Net Funds Available for Settlement by the number of authorized claimants." See Long-Form Notice, ¶7 ("How much will my payment be?"). This objection is OVERRULED.

Lastly, Mr. Kron objects to the cy pres distribution and contends that "[a]ny unclaimed funds should go back to class members . . . ." Id., §IV. Fluid recovery is an accepted disposition of residual funds. See State of California v. Levi Strauss & Co. (1986) 41 Cal.3d 460, 472. Here, the cy pres recipients support projects that further consumers' privacy interests. See Koncius Declaration, Exhibits A to C. This objection is OVERRULED.

c.  Thomas Stauffer

Mr. Stauffer contends that the postcard notice "uses slippery language to obscure the options available" to class members. This contention is not well-taken. The section entitled

"What are my options?" clearly sets forth the options as well the consequences of doing nothing, submitting a claim, opting out, and objecting. This objection is OVERRULED.

Mr. Stauffer also objects to the attorney fees, contending that "[t]his appears to be a money grab" by class counsel. For the reasons set forth in §II.D, above, class counsel's attorney fees are approved. This objection is OVERRULED.

### d.  Patrick E. Standifer

First, Mr. Standifer objects to the fact that the notice does not include an estimate of class member recovery. As indicated above, the notice included the formula for the determination of settlement shares. This objection is OVERRULED.

Second, Mr. Standifer objects to the adequacy of the settlement. Including the late claims (which will be accepted), 23,772 claimants will obtain a pro rata share of the net settlement amount.

Lastly, Mr. Standifer objects to the fee award. For the reasons set forth in §II.D, above, class counsel's attorney fees are approved. This objection is OVERRULED.

### F.  CLAIMS ADMINISTRATION COSTS

The claims administrator requests $281,000,[23] which is $33,000 more than the original bid of $248,000. See Morales Declaration, ¶17. The claims administrator attributes the increase to "the higher claims rate, increased call volume and increased processing time." Id.

The attached invoice also shows that the $281,000 is a discounted rate and that the total costs are actually $305,231.07. Id., Exhibit H. Further, the settlement agreement permits reimbursement of "[a]ll" claims administration costs. See Settlement Agreement, §5.03.

---

[23]  Alternatively, the claims administrator states that, if the Court is opposed to the increase in claims administration costs, it will accept a discounted rate of $270,000. See Morales Declaration, ¶17.

16

The claims administration costs—the bulk of which is for postage and mailing costs ($191,213.96)—appear to be reasonable and may be approved.

### G. FINAL REPORT

The Court may order class counsel to file a final report summarizing all distributions made pursuant to the approved settlement, supported by declaration.

The Court will set a non-appearance date for submission of a final report.

## III. CONCLUSION AND ORDER

### A. TENTATIVE RULING

(1) Grant class certification for purposes of settlement;

(2) Grant final approval of the settlement as fair, adequate, and reasonable;

(3) Award attorney fees of $1,634,000 to *Mount* counsel and $196,204.96 to *Hoffman* counsel.

(4) Award attorney costs of $86,047.04 and $415 to *Hoffman* counsel.

(5) Award enhancement awards of $10,000 to William Mount, $10,000 to Madeline Mount, and $5,000 to Schuyler Hoffman.

(6) Award claims administration costs of $281,000 to CPT Group, Inc.

(7) Order class counsel to file a proposed Order and Judgment, consistent with this ruling by August 20, 2014; and

(8) Order class counsel to provide notice to the class members pursuant to California Rules of Court, rule 3.771(b).

(9) The court orders inclusion of late-filed claims (1,732 claims) identified by the claims administrator.

(10) Upon stipulation of counsel (all counsel), James Collins and Denise Phillips may have until August 18, 2014 to withdraw their objection and opt out of the settlement by filing notice with the Court.

Dated: 8-13-14

AMY D. HOGUE
Judge of the Superior Court

17